IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TILFORD L. BLACK,

        Plaintiff,

v.                                      CIV 10-0499 JCH/KBM

EDDIE HOGAN, Captain,
and MATT CANDELARIA, Captain.

        Defendants.

## <u>PROPOSED FINDINGS<br>AND<br>RECOMMENDED DISPOSITION</u>

THIS MATTER is before the Court on Defendants' *Martinez* Report and Motion For Summary Judgment, and Plaintiff's responses and surreply. *See Docs. 99-101, 105, 107, 109-110.* For the reasons below, the Court recommends that this matter be dismissed for Plaintiff's failure to initiate, much less exhaust, available prison grievance procedures. The Court also finds Plaintiff's "forced labor" claim without merit and, thus, alternatively recommends summary judgment enter on this claim.

## <u>I.  Background</u>

In 2010, when Plaintiff was a pretrial detainee at the Bernalillo County Metropolitan Detention Center ("MDC"), he worked for a little more than a month in the kitchen. MCD housed all kitchen workers in a special unit for efficiency and security reasons. Defendant Hogan supervised the kitchen. A private food vendor supplied the food and verified the inmates' work hours. *See, e.g., Doc. 99-1* (Philip Quintana Aff.,

¶¶7, 12-13) ("*Quintana Aff.*"); *Doc. 99-13* (Eddie Hogan Aff., ¶2) ("*Hogan Aff.*"); *Doc. 99-10* (print out showing cell block assignments for Plaintiff by date); *Doc. 99-11* (screen shots of Plaintiff's work records showing performed while "unsentenced").

Prison regulations, in accordance with national standards, by their terms do not require pretrial detainees to work.  MDC's written policy does not track the national standard precisely, and thus does not expressly state that pretrial detainees are permitted to work on a voluntary basis.[1]  However, according to the evidence in the *Martinez* Report, MDC does follow this policy.  As such, pretrial detainees may work in the kitchen, but only if they choose to do so.  *See, e.g., Quintana Aff.,* ¶5 ("Pre-trial detainees are only assigned to work details if they volunteer to do so.");  *see also Hogan Aff.,* ¶2 ("Pursuant to MDC policy, pre-trial detainees must volunteer to be placed on a kitchen work detail.") (citing *Quintana Aff.* as support); *id.* at ¶5 (Hogan "had no involvement in assigning Mr. Black to work in the kitchen, but know that the only way he or any other pre-trial detainees would be assigned to work on a kitchen detail as a pre-trial detained is if such an inmate volunteered to work in the kitchen, because pretrial detainees are not compelled to work . . . pursuant to MDC policy 18.01, and . . . I am not aware of any deviation from this policy during my tenure as supervisor over the kitchen detail").

The procedure for securing a voluntary work assignment typically consists of:

---

[1] *Compare Doc. 99-6* at 3 (Policy 18.01 – "Pretrial and U[n]-sentenced detainees are not required to work except to do personal housekeeping."), *with Doc. 99-7* at  2 (American Correctional Association standards dated June 2004 – "The facility requires all sentenced inmates to work if they are not assigned to programs. . . .  Pretrial and unsentenced inmates are not required to work except to do persona housekeeping and to clean their housing area. Inmates are allowed to volunteer for work assignments.").

(1) an informal request by the pretrial detainee; (2) communication of that request by a corrections officer to MDC Supervisor Philip Quintana; (3) an eligibility and suitability determination by Supervisor Quintana; (4) and assignment and transfer to the appropriate housing unit by Supervisor Quintana.[2]  *Quintana Aff., ¶5.*

Other than explaining the usual procedure, Defendants cannot document that Plaintiff was assigned to work in the kitchen because he requested to work there, or that Supervisor Quintana vetted and approved him to do so.  An unspecified "County" e-mail "purging" policy leaves Supervisor Quintana without "records of inmate work requests." *Id.*

Once a pretrial detainee volunteers to work in the kitchen, MDC has certain expectations of them.  The Quintana and Hogan affidavits differ a bit on this point. According to Quintana, when volunteer pretrial detainees are assigned to work in the kitchen, their supervisor advises them that they "must be willing to commit to working each shift, because meal times are rigorously scheduled and must occur in an organized manner, requiring that a sufficient number of inmates are present to prepare each meal."  *Id., ¶8.*  And, once accepted for work, pretrial could be subject to discipline for refusing to work, depending on the circumstances.  Thus, their supervisor advises them "that refusing to work is a Class II violation pursuant to MDC policy . . . which may result in disciplinary action depending on whether the inmate has caused a disturbance or engage in other unruly conduct associated with the refusal to work."  *Id.*  On the other hand, if a pretrial detainee "simply declines to work after being assigned to a work

---

[2]  "In 2010, male inmates working on the kitchen detail were housed in unit F-2 [which] is a necessary security measure to ensure that a regular escort by MDC staff is provided to and from the kitchen in an organized and safe manner."  *Quintana Aff.*, ¶6.

detail," MDC enters an "informational disciplinary report . . . so that the inmate is not later assigned to the same work detail," and places the pretrial detained "temporarily . . . in a segregation housing unit for re-classification, until the inmate can be transferred back to his or her original housing unit once space is available." *Id.*

According to Hogan, he never "applied pressure on any inmates or threatened any inmates with punitive measures if they do not wish to work." *Hogan Aff.,* ¶4. However, on May 5, 2010, only a few days after Plaintiff's April 29, 2010 transfer to the kitchen inmates housing unit, *see id.,* ¶12, Defendant Hogan addressed a group of kitchen inmates after they "became unruly . . . complaining about working in the kitchen." *Hogan Aff.,* ¶4.  He told them that:  "their work in the kitchen was performed on a voluntary basis and . . . they were not required to work;" "if they did not wish to work [on a voluntary basis] that an informational disciplinary report would be generated and that they would be returned to their original housing units and would not receive compensation in the form of commissary packs [which was how inmates were compensated] for volunteering and working the the kitchen." *Id.*

The information Defendant Hogan conveyed during this May 5, 2010 discussion was the impetus for this lawsuit, which Plaintiff initiated by a document signed under penalty of perjury dated May 14, 2010, and the Clerk filed May 21, 2010.  *See Doc. 1* at 6.[3]  There is no dispute that Defendant Hogan was the one who delivered the information at the May 5th incident, and that Defendant Candelaria merely observed what transpired during this short conversation.[4]

---

[3] A number of other co-Plaintiffs filed along with him, and they have all were dismissed earlier from this action for one reason or another.  *See, e.g., Docs. 26, 54.*

[4] *See Doc. 3* at 5 ("I was subsequently informed ver[b]al in nature, on May of 6[,] 2010 by

After Plaintiff filed suit, he refused to work on June 11, 2010.  As such, the "informational" disciplinary report, temporary transfer to segregation, and reassignment procedure unfolded for him.  He "was returned to his original housing [and] received no disciplinary sanction for his decision to stop working in the kitchen detail."  *Quintana Aff.,* ¶13; *see also Doc. 99-12* at 1.  Some five months later, he was disciplined and placed in segregation for a week on a wholly unrelated incident.   *Quintana Aff., ¶14; see also, e.g., Doc. 100* at 7 (for disrupting librarian).

When this case came before the Court for initial screening review, District Judge Hansen noted that the "crux of [his suit] is that detention center officers subjected [him] to forced labor."  *Doc. 54* at 4.  Judge Herrera did not allow the original complaint to go forward, and one of the allegations in that document was that "Pretrial detainees['] . . . social security number are being used for tax purpose and illegal activities."  *Doc. 1* at 2.  Judge Herrera denied Plaintiff's motion to amend concerning the same, as well another motion to amend concerning a burn Plaintiff suffered on his hand while working in the kitchen.  *See Doc. 26* at 2; *Doc. 54* at 2-3 (denying, among others, *Docs. 8, 15*).

Accordingly, although Defendants' Motion for Summary Judgment mentions the social security numbers allegations, *see Doc. 101* at 2, a portion of Supervisor Quintana's affidavit is devoted to policies concerning the use of inmate personal information, *see Quintana Aff., ¶2; Doc. 99-2,* and Plaintiff mentions the claim again,

---

[Defendant Hogan] with [Defendant Candelaria], several officers and canteen representatives in the hallway . . . that refusal to participate in this "Volenteer (sic) Program" would result in disciplinary action."); *Doc. 99-14* (Matt Candelaria Aff., ¶ 2 – "I had no personal involvement in resolving  the matter.  Rather, I happened to be in the hallway when I observed Captain Hogan . . . talking briefly to a group of inmates.  I elected to remain in the hallway in the event that he was unable to resolve the matter, as is the customary practice . . . when a disturbance arises . . . I . . . observed the group of inmates return to the kitchen . . . in an orderly and peaceful fashion.").

*see Doc. 100* at 4-5; *Doc. 105* at 4, the Court agrees with Defendants' observation in their omnibus reply that the social security numbers and other assertions throughout Plaintiff's responses are not among the claims in this suit, *see Doc. 109* at 2-3 (alleged issue of personal information and medical care); *id.* at 8 (First Amendment). However, due to the sensitive nature of information contained in Document 8, the Court will sua sponte seal it now.

## II. Law Regarding PLRA Exhaustion

Defendants raise several grounds for dismissal. Lack of exhaustion is a preliminary consideration and wholly dispositive of this matter.

"[U]nder the Prison Litigation Reform Act of 1995 ("PLRA") . . . '[i]nmates are required to exhaust available administrative remedies, and suits filed before the exhaustion requirement is met must be dismissed.'" *Davis v. Jones,* 390 F. App'x 803, 804 (10th Cir. 2010) (quoting district court opinion). An inmate must fully exhaust the grievance process by "'using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" *Woodford v. Ngo,* 548 U.S. 81, 90 (2006) (citation omitted) (emphasis original); *see also Hicks v. Jones,* 332 F. App'x 505, 506 (10th Cir. 2009) ("'An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under the PLRA for failure to exhaust his administrative remedies.') (quoting *Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir. 2002)).

If an inmate does not do so, the Court has no choice but to dismiss his claims on this basis alone. *See Mitchel v. Figueroa,* 489 F. App'x 258, 260 (10th Cir. 2012) ("the record also indicates that he failed to fully exhaust the remedies available to him. Thus,

CASE

the district court was required under the PLRA to dismiss his complaint."); *Davis,* 390 F.

App'x at 804 (because prisoner did not exhaust, "we are obliged to conclude the district

court was correct to dismiss his suit").  As recently held in this District:

> Plaintiff's allegations, if taken as true, paint a disturbing picture.  The Court is very concerned about the circumstances giving rise to this complaint and the serious physical injuries suffered by Plaintiff.  However, under the strict terms of the PLRA, the Court may not address the merits of Plaintiff's complaint without first being satisfied that all available administrative remedies were exhausted.  This Court has no discretion to excuse noncompliance with prison grievance procedures.  *Booth v. Churner,* 532 U.S. 731, 738–41 (2001).  Because the Court has found that Plaintiff failed to exhaust all available administrative remedies prior to filing suit, the complaint must be dismissed.

*Rouse v. Baca,* No. CV 11–0433 MV/CG, 2012 WL 4498866, at *7 (D.N.M. Sep. 25,

2012).

Dismissals for failure to exhaust are made without prejudice so that the prisoner

can exhaust and then return to court with another lawsuit, if possible.  *See Wilson v.

Benzona,* 485 F. App'x 976, 978 (10th Cir. 2012) (panel affirmed dismissal "[b]ut

because the district court incorrectly dismissed the case with prejudice, we REMAND to

the district court so that it may modify its dismissal to be without prejudice for failure to

exhaust administrative remedies."); *Mitchel,* 489 F. App'x at 260 ("Because the district

court dismissed the complaint without prejudice, Mitchell can refile if and when he

actually exhausts his administrative remedies.").

This Court is "obligated . . . to ensure that any defects in exhaustion are not

procured from the action or inaction of prison officials.'"  *Whitmore v. Jones,* 456 F.

App'x 747, 750 (10th Cir. 2012) (quoting *Tuckel v. Grover,* 660 F.3d 1249, 1254 (10th

Cir.  2011)).  "[A]n administrative remedy is not 'available' under the PLRA if 'prison

officials prevent, thwart, or hinder a prisoner's efforts to avail himself of [the] administrative remedy.'" *Tuckel,* 660 F.3d at 1252 (quoting *Little v. Jones,* 607 F.3d 1245, 1250 (10th Cir. 2010)).

Plaintiff does not dispute that he failed to file any grievance before bringing suit. He complains about the procedures he encountered in attempting to obtain a grievance form in the first instance.  He considers the initial procedure "a dictatorship which discourages inmates from exhausting . . . administrative remedies" because an officer determines whether the matter is grievable before providing the inmate a grievance form.  *See Doc. 100* at 5-6.  He asserts that he "had in fact made several attempts to grieve this manner of forced labor and being placed in a segregated housing unit because of his refusal to work [per the June 11, 2010] Disciplinary Report and was told by the Grievance office that this is a non-grievable issue."  *Doc. 100* at 6.  That is precisely what the policy states:  "Housing/Classification assignments – Non-grievable issue (unit, Pod, or Cell/Room Assignments)."  *Doc. 99-5* (Policy 13.09.B.1).  Supervisor Quintana, who oversees the grievance process, interprets the policy in the same way as Plaintiff.  He states that if the issue is grievable then the "inmate is provided with a pre-numbered triplicate grievance ***form*** . . . ***to memorialize*** the complaint ***[and] enter[] into the grievance database for*** tracking . . . investigation and ***a response***."  *Doc. 99-1* (Quintana Aff., ¶ 4) (emphasis added).

The plain terms of the policy do not necessarily lend themselves to this interpretation.  For example, the first point concerning the procedures states that "forms are available upon request."  *Doc. 99-5* at 2 (Policy § C.1).  Also, the grievance can be against the officer who collects and processes the grievances.  Thus it appears that

even with matters deemed nongrievable, the officer who ultimately takes the inmate's grievance is required to sign and date the form and return a copy to the inmate "as a receipt."  *Id.* at 3 (§§ C.1.f-h).  "All grievances received an logged" are to be "entered into the grievance database."  *Id.* (§C.4.).

Even if an officer refused to give him a form, the inmate's ability to file a grievance against the grievance officer defeats Plaintiff's arguments.  In other words, even if the Court concluded that Plaintiff was "subjectively" deterred from filing a grievance, absent some sort of active intimidation or threat, a refusal to provide a form alone would not "'deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the prison administrative process that the inmate failed to exhaust,'" given that Plaintiff could have filed a grievance against the officer for failing to give him a form.  *Rouse,* 2012 WL at *6 (quoting *Tuckel,* 660 F.3d at 1254).  A deliberate bypass of "discouraging" procedures is not excusable in this Circuit. *See, e.g., Markovich v. Correct Care Solutions,* 406 F. App'x 264, 266 (10th Cir. 2010) ("We have previously rejected a prisoner's attempt to bypass a prison's grievance system by improperly filing an emergency grievance.") (citing *Brewer v. Mullin,* 130 F. App'x 264, 265–66 (10th Cir. 2005), for proposition that an inmate "may believe that prison officials erred in deciding his issues were not emergencies, but that does not mean that he can simply ignore their determination and opt out of the grievance procedure"); *Musacco v. Torres,* 333 F. App'x 385, (10th Cir. 2009) ("Mr. Musacco also contends that his lawsuit should not be dismissed for failure to exhaust administrative remedies because the relevant prison officials withhold policy handbooks, make it difficult for inmates to file grievances, and do not adhere to the formal grievance policy

themselves. . . .  Moreover, any alleged interference with his ability to file and complete

the grievance procedure is irrelevant . . . The problem is that he did not allow his dental

care grievance to proceed to its conclusion before he filed the present suit.").

Because the grievance procedure required that the grievance be filed within ten

days of the event, *see Doc. 99-05* at 3 (§C.2), which here is the May 5, 2010 discussion

that triggered this suit, Plaintiff's time to file a grievance expired before he initiated this

action in mid-to-late May 2010.  He has no further avenue of relief under the prison

grievance policy at this point in 2013.  Accordingly, any dismissal the Court enters for

failure to exhaust is effectively with prejudice, no matter what label the Court attaches to

the dismissal.

## III. Alternatively, The Claims Are Without Merit

Due to Plaintiff's allegation that he was not provided grievance forms when he

requested them, Defendant's interpretation of their grievance policy that appears to

"thwart" an inmate's ability to lodge a grievance, and Defendants' briefing on the merits,

the Court will alternatively consider the claims.[5]

---

[5] *See, e.g., Bredbenner v. Malloy,* No. CIV. 11-739-SLR, 2013 WL 652430, at *5 (D. Del. Feb. 20, 2013) ("prison authorities may waive the exhaustion requirement if the ultimate administrative authority fully examines the inmate's complaint on the merits, regardless of whether the complaint complied with the prison grievance process") (citing *Camp v. Brennan,* 219 F.3d 279, 281 (3rd Cir. 2000), and *McKinney v. Guthrie,* 309 F. App'x 586, 587 (3rd Cir. 2009)); *Elrod v. Walker,* No. 06–3115–SAC, 2011 WL 6372881, at *5 (D. Kan. Dec. 20, 2011) ("The Tenth Circuit has recognized in unpublished cases that administrative remedies are not 'available' when prison officials refuse to provide prisoners with grievance forms.") (citing *Baldauf v. Garoutte,* 137 F. App'x 137, 141 (10th Cir. 2005) and *Hoover v. West,* 93 F. App'x 177, 181 (10th Cir. 2004)), *aff'd,* No. 12-3058, 2012 WL 3871709 (10th Cir. Sept. 7, 2010) ("Because that court's reasoning appears sound, we affirm for substantially the reasons stated in the decisions below.  We add only that the dismissal of claim 5 can also be supported by the district court's later determination that Mr. Elrod provided no proper evidence that he had been denied the necessary forms."); *c.f., Freeman v. Watkins,* 479 F.3d 1257, 1620 (10th Cir. 2007) ("As *Jones* makes clear, exhaustion is an affirmative defense."); *Smalls v. Stermer,* No. 10–3025–JTM, 2011 WL 1234781, at *11 (D. Kan. Mar. 31, 2011) ("defendant waives the exhaustion requirement if it considers plaintiff's defective filings on the merits.") (citing *Ross v.*

Plaintiff first maintains that he never signed a "waiver" agreeing to "participate in the . . . volunteer work program." *Doc. 100* at 3.  Though he believes that Defendants' own submissions establish this necessary written waiver, the Court has combed the *Martinez* Report attachments and finds no mention of any such waiver.

Similarly, Plaintiff contends that because his operative pleading that alleges forced labor is verified, *see Doc. 3* at 10; *Doc. 105* at 4, this suit must go to trial because it presents a situation where Defendants are "say[ing] it happened one way," and Plaintiff "has submitted proof that it happened the way the Plaintiff[] describe[s] it." *Doc. 105* at 4.  However, the record does not demonstrate that Plaintiff was "forced" to do anything or was punished for not working.  MDC simply moved him out of the unit that exclusively housed kitchen workers, as Defendant Hogan said would happen during his May 5, 2010 discussion.  Indeed, the description portion of disciplinary report states that when Plaintiff refused to work and was advised "he would be moved out because he was not going to work and this is a work pod," he responded:  "'ok  I was expecting to be moved out.'" *Doc. 99-12* at 1.  The disposition portion of the report states Plaintiff "was escorted to segregation unit for reclass[ification] and NOT sentenced – No action taken." *Id.*

Plaintiff asserts that the Court's copy of the disciplinary report is a "forgery" and directs the Court to "look at the "Evidence and Exhibits" to see that his original copy did not have a disposition mentioned.  *See Doc. 100* at 6-7.  The original pleadings referred the Court to "exhibits attached, to all affidavits" and to "Exhibits B, E, G, H, I, and J,"

---

*County of Bernalillo,* 365 F.3d 1181, 1186 (10th Cir. 2004)), *aff'd,* 457 F. App'x 715, 718 n.4 (10th Cir. 2010) ("In affirming . . . that Smalls failed to state a claim upon which relief can be granted, we need not consider the district court's further conclusions that Smalls failed to exhaust his administrative remedies as to these claims").

respectively.  *See Doc. 1* at 2; *Doc. 3* at 3-4.  The Court has looked through all of the previously-submitted documents and initial affidavits, and has not located another copy of the disciplinary action regarding Plaintiff.[6]

Lest the proceedings become sidetracked further by allegations that Defendants did not send, or the Court misplaced, a copy of this document some two years ago, the Court will assume for the purposes of argument that, as he asserts, Plaintiff's copy of the disciplinary report did not mention a disposition.  Regardless, Plaintiff takes no issue with the descriptive section, which indicates that he knew he was to be transferred because he no longer wanted to work.  Nor does he dispute that was what transpired after he refused to work.

Even further assuming that Plaintiff thought he would be sent straight away to another housing unit, rather than being placed in segregation before he was reclassified and relocated, he does not dispute that the stay in segregation during this transition lasted three days at most.  *See Quintana Aff.,* ¶ 13 ("moved to segregated housing unit #2 temporarily on June 11, 2010, until a space for him was located on June 14, 2010, at which point he was returned to his original housing").  This does not rise to the level of a constitutional violation because he has no right in an "assignment to any particular housing unit."  *Dougherty v. Virginia,* 2013 WL 750140, at *6, n.10 (W.D. Va. Feb. 27, 2013) (citing *Altizer v. Paderick,* 569 F.2d 812, 812–13 (4th Cir. 1978)); *see also, e.g., Guinn v. Cooper,* Nos. 93-1247, 93-1303, 1994 WL 75848, at *1 (10th Cir. Mar. 8, 1994)

---

[6] The Court found a disciplinary report concerning another kitchen inmate concerning stealing and abusive language toward staff.  *See Doc. 6* at 4.  As Defendants averred in their Answer, Plaintiff refers to exhibits he never submitted with his initial pleadings.  *See Doc. 96* at 1, 3, 4. He did not file them after Defendants' answer.  *See also Doc. 109* at 10.

("Plaintiff has no constitutional right to continued incarceration at any particular facility or under any particular classification.") (citing *Moody v. Daggett,* 429 U.S. 78 (1976)).

Thus, the material and dispositive facts are not in dispute, and nothing in this record suggests forced work, or placement in segregation as "punishment" for a refusing to continue to work. None of the factual circumstances surrounding Plaintiff's transfer to another housing unit rise to the level of a constitutional violation. There is no dispute that Defendant Candelaria had no personal involvement in May 5, 2010 discussion or the disciplinary and reclassification situation.

For these reasons, and the additional points and authorities Defendants discuss, Plaintiff's allegations do not rise to the level of a constitutional violation against either defendant, either in an individual or official capacity. *See Doc. 101* at 11-16; *see also Doc. 54* at 4. Consequently, the matter can alternatively be dismissed with prejudice as without merit.

Wherefore,

**IT IS HEREBY ORDERED** that the Clerk immediately seal Document 8.

**IT IS HEREBY RECOMMENDED** that the presiding judge either dismiss this action without prejudice for failure to exhaust or, alternatively, grant Defendants' motion for Summary Judgment *(Doc. 101)* and dismiss this action with prejudice as lacking merit.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the**

**fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

UNITED STATES CHIEF MAGISTRATE JUDGE